**UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff,**

v.

**CITIZENS ELECTRIC COMPANY, Defendant.**

No. 90–350C(7).

United States District Court, E.D. Missouri, E.D.

June 28, 1991.

Jeffrey Cramer, Brown & James, St. Louis, Mo., for plaintiff.

James Erwin, Crystal Greiman, Thompson & Mitchell, St. Louis, Mo., for defendant.

## MEMORANDUM AND ORDER

HAMILTON, District Judge.

Plaintiff United States Fidelity & Guaranty Company (hereinafter USF & G) and defendant/counterclaim plaintiff Citizens Electric Corporation (hereinafter Citizens Electric) have filed trial briefs and a joint stipulation of facts. Plaintiff USF & G seeks a declaratory judgment that it has no duty to defend or indemnify Citizens Electric as a potentially responsible party under CERCLA, 42 U.S.C. § 9601, *et seq.*, for the cleanup and remediation of PCB contamination at the Missouri Electric Works site in Cape Girardeau, Missouri. Citizens Electric, by counterclaim, seeks a declaration that the costs it has incurred and will incur with respect to investigation and remediation at the Missouri Electric Works site and the defense of the claim brought against it by EPA are covered by the primary and excess policies of insurance issued to it by USF & G. In addition USF & G seeks damages for breach of contract. The parties stipulate that the only issue before this Court is "whether the costs and expenses which Citizens Electric has incurred and will incur in the future for the Missouri Electric site are sums which Citizens Electric shall be legally obligated to pay as damages because of property damage caused by an occurrence." (¶ 26 Joint Stipulation).

In June of 1987 the EPA notified Citizens Electric that Citizens Electric was considered a potentially responsible party as defined under CERCLA for costs of investigation, project planning, and cleanup of polychlorinated biphenyl (hereinafter PCB) contamination at the Missouri Electric site. (¶ 3 Joint Stipulation). The Environmental Protection Agency alleges that Citizens Electric sent oil-filled electric equipment to the Missouri Electric site from 1953 through 1976. (¶ 4 Joint Stipulation). In December, 1988, Citizens Electric and other named potentially responsible parties entered into an Administrative Order on Consent. Under the terms of the Order on Consent, Citizens Electric was required to conduct a remedial investigation and a feasibility study of the PCB contamination at the Missouri Electric site. (¶ 6 Joint Stipulation). The studies were completed in July, 1990. (¶ 7 Joint Stipulation). In September, 1990, EPA issued its Record of Decision. The estimated cost of the remedial action will be $8.4 million for soil remediation measures and $730,000 for ground water remediation measures. (¶ 8 Joint Stipulation).

From January of 1968 through November of 1972 and November of 1973 through November of 1983, USF & G insured Citizens Electric under its standard-form comprehensive general liability policy (hereinafter CGL).[1] (¶ 9 Joint Stipulation). USF & G insured Citizens Electric under excess policies of liability insurance from October

---

1. At least fourteen separate general liability policies and thirteen excess policies covered the period in question. (¶¶ 14, 15 Joint Stipulation). The parties have stipulated that the standard insuring agreement and standard definitions set forth in Exhibit 30 reflect the coverage terms from November of 1968 to November of 1972. (¶ 18 Joint Stipulation). Exhibit 31 reflects the coverage terms from November of 1973 to November of 1976. (¶ 19 Joint Stipulation). Policy R1CC824421 (Exhibit 10) reflects the coverage terms from November of 1976 through November of 1979. (¶ 20 Joint Stipulation). Beginning during 1979, USF & G began using a revised CGL insurance form. The parties stipulate that the insuring agreement and standard definitions in Exhibit 10 reflect the coverage terms from November of 1979 through November of 1983. (¶ 21 Joint Stipulation).

of 1969 through November of 1982.[2] (¶ 10 Joint Stipulation). After notice of the EPA claim, USF & G responded with a reservation of rights pending completion of its investigation. (¶¶ 11, 12 Joint Stipulation). On December 7, 1989, USF & G denied coverage of the claim. (¶ 13 Joint Stipulation).

All of the general liability coverage policies contain the same coverage provision. That provision reads in pertinent part:

*Coverage B—Property Damage Liability*

The Company will pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as *damages* because of

A. *bodily injury* or

B. *property damage*

to which this insurance applies, caused by an *occurrence,* and the Company shall have the right and duty to defend any suit against the *Insured* seeking *damages* on account of such *bodily injury* or *property damage,* even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

Policies from 1968 through 1972 defined *damages* as "damages ... for loss of use of property resulting from *property damage.*" Later policies did not define the term. The 1968 through 1972 policies defined *occurrence* as "an accident, including injurious exposure to conditions, which results, during the policy period, in *bodily injury* or *property damage* neither expected nor intended from the standpoint of the *insured.*" Later policies added the words *continuous or repeated* before *exposure.* The 1968 through 1972 policies defined *property damage* as "injury to or destruc-

tion of tangible property." Later policies defined *property damage* as

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use caused by an *occurrence* during the policy period.

Policies after 1972 also included pollution exclusions as follows:

This insurance does not apply ...

(f) to *bodily injury* or *property damage* arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The coverage provision in the excess policies from 1969 through 1981 provided:

3.1 *Coverage.* The Company will indemnify the *Insured* for all sums which the *Insured* shall become obligated to pay as *damages* and *expenses* ... by reason of liability imposed upon the insured by law, or by contractual liability, because of

(1) *personal injury* or *property damage,* cause by or

(2) advertising liability arising out of an *occurrence* which takes place anywhere.

After 1981, the coverage provision read as follows:

*Coverage.* The Company will indemnify the *Insured* for all sums which the *Insured* shall become legally obligated to pay as damages because of *bodily injury, personal injury, property damage,*

---

**2.** The parties stipulate that the standard insuring agreement and standard definitions set forth in Exhibit 32 reflect the coverage terms from October of 1969 through November of 1973. (¶ 2 Joint Stipulation). Exhibit 33 covers the period from November of 1973 through November of 1981. (¶ 23 Joint Stipulation). Exhibit 34 covers the period from November of 1981 through November of 1982. (¶ 24 Joint Stipulation).

or *advertising injury* to which this policy applies caused by an *occurrence* which takes place anywhere.

The excess policies covering the period 1969 through 1973 defined *property damage* and *occurrence* as the general liability policies defined them from 1968 to 1973. *Damages* is defined in the excess policies as "all sums which the *Insured,* or any company as his Insurer, or both, become legally obligated to pay as damages, whether by reason of adjudication or settlement. . . ." The term *expenses* is defined as "all reasonable expenses incurred by the *Insured* in the investigation, settlement, and defense of any claim or suit seeking such damages. . . ." Policies from 1973 through 1982 added the same pollution exclusion as found in the general liability policies.

In *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* the Eighth Circuit held that the term *damages* is not ambiguous in the insurance context and that the plain meaning of the term *damages* used in CGL policies refers to legal damages and does not cover cleanup costs. *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d 977, 985 (8th Cir.1988), *cert. denied, Missouri v. Continental Ins. Cos.,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). The Eighth Circuit cited *Robin v. Blue Cross Hospital Service,* 637 S.W.2d 695, 698 (Mo. banc 1982) as the source for the applicable Missouri law. No Missouri case is directly on point, but *Robin* sets out the rules of insurance agreement construction as follows:

> The rules of construction applicable to insurance contracts require that the language used be given its plain meaning. If the language is unambiguous the policy must be enforced according to such language. If the language is ambiguous it will be construed against the insurer. Language is ambiguous if it is reasonably open to different constructions; and language used will be viewed in light of the "meaning that would ordinarily be understood by the lay[person] who bought and paid for the policy."

*Robin v. Blue Cross Hospital Service,* 637 S.W.2d at 698 (Mo. banc 1982) (citations omitted). The Eighth Circuit, while holding the term *damages* was not ambiguous, stated:

> Viewed outside the insurance context, the term "damages" is ambiguous: it is reasonably open to different constructions. . . . The dictionary definition does not distinguish between legal damages and equitable monetary relief. . . . Thus, from the viewpoint of the lay insured, the term "damages" could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses.

*Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d at 985. The dissent views this concession as dispositive and notes that, to the extent the word *damages* is open to different constructions, it must be accorded the meaning ordinarily given it by a lay person. *Id.* at 988 (Heaney, J., dissenting). *Robin v. Blue Cross Hospital Service* provides a formula for determining if language is ambiguous. Under that standard a term such as *damages* is ambiguous if it is "reasonably open to different constructions," and that determination must be made "in light of 'the meaning that would ordinarily be understood by the lay [person] who bought and paid for the policy.'" *Robin,* 637 S.W.2d at 698. The majority admits that the lay person would understand the term *damages* to include equitable remedies. Furthermore, the majority recognizes that under Missouri law the cost of restoring property to its original condition is one measure of damages. *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d at 987.

Defendants urge this Court to follow the reasoning in *Jones Truck Lines v. Transport Ins. Co.,* No. 88–5723, 1989 WL 49517 (E.D.Pa. May 10, 1989). That court addressed the same issue applying Missouri law and concluded that costs incurred in the investigation and cleanup of hazardous waste sites are covered "damages" under a CGL policy. It specifically recognized the contrary Eighth Circuit holding and stated it would defer to the Eighth Circuit decision unless it found that the Circuit Court

ignored clear signals emanating from the state courts or clearly misread state law. The Court in *Jones Truck Lines* concluded that to be consistent with the Eighth Circuit holding in *McMichael v. American Ins. Co.*, 351 F.2d 665, 669 (8th Cir.1965), the term *damages* must be given a meaning ordinarily understood by a layperson.[3]

While the reasoning of the dissent in *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.* and the reasoning of the Federal District Court in Pennsylvania in *Jones Truck Lines v. Transport Ins. Co.* are consistent with the principles of construction of insurance contract terms under Missouri law, this Court is constrained solely by reason of *stare decisis* to follow the majority opinion in *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*

ACCORDINGLY,

IT IS HEREBY ORDERED that JUDGMENT is entered in favor of Plaintiff United States Fidelity & Guaranty Corporation and against Defendant Citizens Electric Corporation.

---

3. *See also*, Note, *Jones Truck Lines v. Transport Insurance Co.: More Fuel for the Heated Debate over Insurance Coverage for CERCLA Clean Up Costs*, 35 S.D.L.Rev. 298 (1990). (emphasizing that the Eighth Circuit's reasoning and the *Jones Truck Lines* Court's reasoning conform to each other in most respects while reaching opposite conclusions). This note addresses the distinction made by the Eighth Circuit as follows:

In the absence of such a distinction in the policy, it is difficult to conceive how a defini-

tion of "damages" that is grounded upon the ancient division between law and equity— such as the definition proffered by the Eighth Circuit—could be labeled as the "ordinary and accepted meaning" of "damages" in the eyes of a reasonably prudent layperson. *Id.* at § IV. The author reached the conclusion that there was "no basis in Missouri law for the ·Eighth Circuit's quantum leap into the highly technical realm of insurance terminology." *Id.* at § IV.